IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 4, 2003

## STATE OF TENNESSEE v. TYRONE CUNNINGHAM, AKA TYRONE CUMMINGHAM

**Appeal from the Circuit Court for Lauderdale County**
**No. 7059    Joseph H. Walker, III, Judge**

---

**No. W2001-02941-CCA-R3-CD - Filed July 24, 2003**

---

The defendant, Tyrone Cunningham, appeals from his conviction by a Lauderdale County Circuit Court jury of second degree murder. The trial court sentenced him as a career, violent offender to the maximum sentence of sixty years. The defendant contends that (1) the evidence is insufficient to support his second degree murder conviction, (2) the trial court erroneously denied his pretrial motion for a continuance, and (3) the trial court erred in sentencing him as a career offender. We affirm the trial court's judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Didi Christie, Brownsville, Tennessee (on appeal); Gary F. Antrican, District Public Defender; and David S. Stockton, Assistant District Public Defender (at trial), for the appellant, Tyrone Cunningham, aka Tyrone Cummingham.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlin, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey Anne Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the November 27, 2000 beating death of inmate Joseph Williams. Corporal Bryan Fiedler of the West Tennessee State Penitentiary testified that the defendant and victim were both inmates at the prison. Before November 27, 2000, he had never seen a conflict between the defendant and the victim. On the day of the incident, he was standing in front of the guard shack checking the inmates leaving the dining hall for contraband. He said he saw the defendant step out of the industry building and strike the victim on the head with a metal roller pin. He said he saw the defendant hit the victim two or three times and the victim fall to the ground. He

said the defendant kept hitting the victim in the head until the officers arrived. He said that the defendant struck the victim a total of seven or eight times in a matter of seconds and that while the defendant was striking the victim, the defendant was yelling "Die, M-F, die." Four correctional officers subdued the defendant, and Corporal Fiedler secured the metal roller pin. Corporal Fiedler said that when he went to restrain the victim, he saw the victim was unarmed and needed first aid as soon as possible. He said that as the officers led the defendant away, the defendant yelled, "I hope you die, M-F, I hope you die."

Corporal Fiedler testified that the guard shack, where the yard officers were posted, was located in the middle of the yard directly across from the inmate dining area. Next to the guard shack was a fence with a gate that led to the industry building. The industry building consisted of the Wilson ball plant, where sports balls were inflated and packaged, and a separate sewing area, where inmate clothing was made. All traffic going into the industry building must pass through a door, a metal detector, and another door before reaching the ball plant. He identified a photograph of a conveyor belt with a missing metal roller pin inside the ball plant. He said the industry building contained wooden skids for loading the balls, standing metal ashtrays, mops, brooms, and metal trash cans, which were more readily available to the defendant than the metal roller pin.

Corporal Fiedler testified that when inmates arrive at the prison, they are told the procedures for notifying the authorities if they feel threatened and that there are a number of people to whom they can go to if they have problems. He said that although other inmates came to him in the past with problems, the defendant never asked to be moved to a new location. He said the defendant could have been housed or could have worked where he would not have come into contact with the victim. He said that a few days after the incident, the defendant told him that he and the victim had been having conflicts for a while and that he could not take it anymore. He said that at the suppression hearing, the defendant said that he knew what he had done was wrong but that "he had to do what he had to do." He also said that before the incident, the defendant was a quiet inmate, stayed to himself, and had the reputation that no one should "mess" with him. He said that after the attack, the defendant's reputation was that if you messed with him, he would kill you.

Corporal Fiedler testified that he had often spoken with the victim, who was deaf but able to speak a little with a speech impediment. He said that although hearing aids helped the victim hear a little, the victim used signs to communicate. Corporal Fiedler knew sign language, and he said the victim would stop and joke with him daily. He said that while he had worked at the prison, the victim had never been in Unit Six, which was reserved for the worst inmates.

On cross-examination, Corporal Fiedler testified that he is trained to respond to gang situations and that the Gangster Disciples were one of the largest security threats at the prison. He agreed that he did not observe the defendant and the victim together at work and did not know what had occurred between them that morning. He also said that he was familiar with the conveyor belt from which the roller pin was removed and that, previously, the yard officers would check the roller pins to make sure they were secure. He said that although the victim had a reputation for being a gang member, he had not discussed it with the victim. On redirect examination, Corporal Fiedler

testified that no gang members helped the victim during the beating. He agreed that inmates had lied to him about gang affiliations. He agreed that usually retaliation follows the beating of a gang member but said that no one had retaliated against the defendant. He acknowledged that the defendant was currently in a single cell in a maximum security unit and had only one hour of exercise every other weekday.

Officer Jason Hurst testified that at the prison, inmates usually go to lunch around 11:45 a.m. and have about one hour to eat. As the inmates leave the dining area, officers search them for eating utensils and contraband. He said that around 12:45 p.m. on November 27, 2000, he was working in the general population and saw a fight outside the industry building. He said the unarmed victim was about to enter the industry building when the defendant came out of the building's door and hit the victim with a large metal object. He said the defendant raised the weapon above his head, hit the victim twice, and then used both arms to strike the victim again. He said that the victim fell to the ground and that the defendant hit him three or four more times. Officer Hurst said that as the defendant was hitting the victim, the defendant said, "I hope that M-F dies" and "Die, N, die." He said that as he and the other officers restrained the defendant, the defendant continued to repeat these statements. He said the officers placed the defendant on the ground and stayed on top of him while handcuffing him. He said no one aside from the correctional officers came to the victim's aid. Officer Hurst said that on August 20, the defendant told him that he knew what he had done was wrong and that if security had been better, the incident would never have happened.

On cross-examination, Officer Hurst testified that after the incident, he took the defendant to segregation. He said the defendant told him that the victim had harassed him for ten months and that he hoped the victim died. He said when asked if he had a knife, the defendant said, "If I had one, I would have used it." Officer Hurst said the defendant was aggressive and hostile on the day of the offense.

Stephanie Maxwell, a registered nurse at the prison, testified that she had first cared for the victim after he was raped at Fort Pillow years earlier. The victim was deaf, blind in one eye, and had a speech impediment. She often came into contact with the victim because of his medical needs and characterized him as light-hearted and never causing any trouble. She said that on November 27, 2000, she was called to the industry building around 12:45 p.m. to respond to an injured inmate. She said that she saw the victim lying in a pool of blood and his face was unrecognizable due to his injuries. The victim had a pulse and was breathing, but his injuries were too extensive to treat at the scene, and they took him to the prison's emergency room. She said that while they were attending to the victim, the defendant, who was angry and hostile, yelled, "I hope that M-F dies," and "Die, n****r, die." The victim, who had disfiguring facial injuries, died in the prison emergency room.

Ralph Gromley, a registered nurse at West Tennessee State Penitentiary, testified that when he arrived at the scene on November 27, 2000, he saw the victim lying in a pool of blood but did not recognize him due to his massive head trauma. He said that as guards restrained the defendant, the defendant was yelling, "Die, you motherf*****g n****r, die." He said that the dining hall is about fifty yards from the industry building. He said that he conducted monthly sanitation inspections of

the prison buildings for the state and that most things in the industry building that could be used as weapons were secured.

Misty Bentley, a nurse, testified that she responded to the November 27, 2000 attack on the victim. She said that she first went to the defendant, whom officers were restraining, but turned her attention to the victim after the officers explained that it was the victim who was injured. She said she was close enough to see the defendant and could not see any injuries on him, although she was not able to examine his face. She said the defendant was yelling that he hoped he had killed the victim. She also said that she knew the victim, who was always laughing and joking with her, and that he had never been a problem.

Joseph Vernon, an Internal Affairs Investigator with the Tennessee Department of Correction (TDOC), testified that inmates receive a handbook that gives instructions for handling problems with other inmates. Some of the possible remedies for these problems are moving the inmate to different housing; a different site, which is basically a different facility at the same institution; or a separate institution. The inmate could also request protective custody, which involves being separated from the general population. He said that whenever an inmate had come to him asking to be moved, the request was always honored if the threat was verified. He said that any problems the defendant was having had never been brought to his attention.

Investigator Vernon testified that in his investigation of this case, he took approximate measurements at the prison. The distance from the industry door to the dining area was 193 feet, and the distance from the door to the place where the rolling pin was originally located was 84 feet for a total distance of 277 feet from the dining hall to the roller pin. He said the industry building contained many things that could be used as weapons. He said that he attempted to interview the defendant after the incident and that the defendant asked only if the victim had died. He said he took pictures of the defendant after the attack and noticed a superficial cut on the defendant's lip but did not know how the defendant got the cut. He said that at the suppression hearing, the defendant said that he was sorry he did it but that he did what he had to do. On cross-examination, he said being labeled a snitch sometimes subjects an inmate to retribution. He said he did not know of any gang-related activities or attacks in which the victim participated. He agreed the Gangster Disciples were probably at West Tennessee State Penitentiary. He agreed that white tissue paper containing what could have been bloodstains was found in a trash can in the industry building, but he had not tested it because he was instructed that there was no need for a test.

The defendant testified that he was serving a life sentence at West Tennessee State Penitentiary, had been incarcerated for ten years, and had never had a problem with fighting. He said that he was not in the same housing unit as the victim and that although he did not know the victim at the time, the victim touched his hair in the cafeteria line one day. He said he told the victim to keep his hands off him and asked another inmate if he could get in front of him in line. He said the victim cursed at him throughout that meal. The defendant said that he decided to walk away but that the victim continued to call him names, such as "bitches and whores," in the cafeteria and prison yard. He said other inmates told the victim to leave him alone. He said that in March, he began

working in the ball plant where both he and the victim operated tape machines. He said that at the ball plant, two roller pins were loose and could be removed from the conveyor belt.

The defendant testified that on his first day at the ball plant, the victim gestured at him but that he ignored it. He said his problems with the victim worsened because he did not confront the victim. He said that more than once, the victim left his work area and tried to provoke a fight with him. He said he would tell the victim to leave him alone and then go to the restroom to smoke a cigarette. He said the victim made threats that he would rape him or kill him. He said in addition to the threats, the victim would kick him or elbow his back near the time clock, push or bump against him at the water fountain and in the cafeteria, and spit on him. He said that the police were not always around and that an inmate could do pretty much whatever he wanted while a truck was at the back. He said he did not want to provoke the victim because, although he could have fought the victim, he did not want to be raped by a group of people. The defendant said that he refused to join a gang but that the victim was a gang member. He said he felt that eventually the victim would have raped or killed him or allowed another person to do something to him.

The defendant testified that on the day of the offense, nothing happened until it was time to go to lunch. He said that as he was standing in line to clock out, the victim pushed him from behind, resulting in a cut to his lip. He said that the victim hit him and that although he did not want to, he fought back. The defendant said that they fought three times and that the victim beat him up. He said that this was the first physical fight between the two of them. He said that he tried to make peace with the victim after each fight and that other inmates tried to stop the fight but that the victim kept fighting. The defendant said that his lip, eyes, and nose were swollen and that his mouth was cut from the fight but that he did not seek medical attention. He said that after the fight, he went to eat, but only ate half of his food. He said he could not go to the correctional officers because he was afraid of retribution.

The defendant testified that as he was returning to the industry building, he saw the victim talking to another gang member and at least two other gang members standing by them. He said the victim threatened to rape him after they entered the building and showed him a brown paper bag in the victim's coat. He said he was not sure what was inside the bag. He said that the door to the industry building was not open when he arrived but that after it opened, he was one of the first to enter. He was searched as he went into the ball plant. The defendant said that just before he went into the ball plant, the victim touched his buttocks and smiled at him. He said that after the victim touched him, he was scared, not thinking clearly, and "95 percent of [his] mind was confused." The defendant testified that he was already disturbed by being in prison, the victim's harassment and beatings, and having to avoid getting hurt constantly. He said he felt as if this was a life or death situation because he knew the victim was in a gang and he had already done all he could to defend himself.

On cross-examination, the defendant testified that he had walked away from the victim for ten months before he killed the victim. He admitted that he never went to a correctional officer and complained about his problem with the victim under the grievance procedure but said these

procedures do not work. He admitted he got the metal roller pin from the conveyor belt and killed the victim. He said that when he got the roller pin, the only thing on his mind was the victim and the pin. On redirect examination, he said that after the victim had harassed him for five or six months, he complained to Big T, a ranking member of the Gangster Disciples, about his problem with the victim. He said that the gang put the victim on violation but that after a week and one-half, the victim started causing problems for him again and called him a snitch.

Officer Bobby Hooper testified that he was the only officer working on the ball plant side of the industry building on November 27, 2000. There were thirty-two inmates working on the sewing side and thirty-six inmates on the ball plant side that day. As the inmates enter the building, he takes their identification cards to keep track of how many inmates are in the building. At lunchtime, one officer stands just inside the door and searches the inmates. A yard officer watches the metal detector, and a third officer stands just outside the industry building door and hands the inmates their identification cards. None of the three officers have a clear view of the time clock inside the ball plant as the inmates are leaving for lunch. He said it usually takes about twenty minutes to go through all of the inmates working in the building. As soon as they get their cards, the inmates walk to the dining area. Officer Hooper said that as the defendant, whom he described as quiet and hardworking, left the building to go to lunch on the day in question, he noticed a fresh cut on the defendant's lip. He said that when he asked the defendant about it, the defendant grabbed his card and left without saying anything. He said he was not aware of any fights between the defendant and the victim before they went to lunch that day.

Officer Hooper testified that when both of the officers working in the industry building return, they take the inmates' identification cards and search them again before letting the inmates back into the building after lunch. He said an officer does not watch the metal detector when the inmates return from lunch. On the day of the victim's death, the defendant was one of the first inmates back from lunch. Officer Hooper was standing by his desk in the work area next to the door that leads into the ball plant side of the industry building searching inmates as they returned from lunch. He said he searched the defendant and proceeded to the next inmate. He said the defendant then ran past him with a roller pin. He said he shouted at the defendant to stop, the defendant kept running, and he chased the defendant. He said the defendant ran through the crowd of inmates in the building with little difficulty because they separated for him. Officer Hooper said that he had trouble passing through the crowd and that when he reached the door, he saw the victim on the ground and the defendant hitting him with the roller pin. He said he tackled the defendant, disarmed him, and held him until other officers arrived. He said that the defendant tried to get up but that he continued to hold him. He said that after the incident, the inmates were returned to their cells and the industry building was secured. He said he identified the defendant's coat for Tennessee Bureau of Investigation (TBI) agents, who found paper towels with what appeared to blood on them in the pocket.

Officer Hooper testified that he knew of no conflicts or fights between the defendant and the victim in the days or weeks preceding the attack. He agreed that the defendant and the victim worked within eight to ten feet of each other. He said he was not always in a position to watch them

because he must remain at the back door when trucks are present. While he is with a truck, no other officer is assigned to take his place inside the building. A Tricor supervisor tries to be in the work area while he is with a truck, and the building does not have video cameras. Officer Hooper said that although he arrives before the inmates, he does not have time to search the building for weapons due to its large size. He said tools such as screwdrivers, wire pliers, and box cutters are given to the inmates who work with them and then locked up as the inmates leave the building. He said the rolling pin that the defendant used came from a conveyor belt, but he did not know whether it was secured or not.

On cross-examination, Officer Hooper testified that the attack occurred at the end of the lunch hour around 12:47 p.m. He said that although the defendant could have returned first occasionally, he was not usually one of the first inmates back from lunch. He said that the inmates used the same procedures to go to and from lunch every day and that the door to the industry building was open to allow the inmates to return to work . He also said that at the time the defendant ran out with the roller pin, he had no doubt that there was no actual or imminent threat to the defendant.

Inmate Robert Atkins testified that he knew both the victim and the defendant and worked with them at the ball plant. He said that on the morning of the offense, he and the defendant had finished working on their footballs and that he prepared to work on the footballs on the victim's line. He said the defendant did not want to work on the victim's footballs and sat down. He said that the victim yelled but that the defendant did not respond to him. He said he came out of the bathroom before going to lunch and discovered that the defendant and the victim had been fighting. He said the defendant's face was red from being punched by the victim. He said that the defendant extended his hand and asked the victim to shake because they were not afraid of each other but that, instead, the victim knocked the defendant down and punched the defendant's face. Mr. Atkins said Officer Hooper did not see the fight from his position in the front. He said there was nothing but anger in the defendant's face when he finally got up. Mr. Atkins said the defendant went to lunch but, instead of eating, threw his food away. He said that the defendant went back to the industry building and that as the victim got to the door, the defendant came out and started beating him. He said the victim was an enforcer for the Gangster Disciples. On cross-examination, he said the defendant did not show that he was afraid of anyone.

Inmate Darrell Sellers testified that at the time of the incident, he had known the defendant for about three months because they worked together at the ball plant. He said that on the morning of the attack, he was clocking out to go to lunch when he turned around to see the defendant and the victim fighting. He said both the defendant and the victim threw punches, and the victim knocked the defendant to the ground. He said the defendant said, "Joe, why you keep f*****g with me? I told you to leave me alone. Quit f*****g with me," and the victim responded by saying, "I f**k with you when I want to." He said the victim hit the defendant again, starting another fight, which lasted two or three minutes. He said both participants threw punches, and the defendant fell or slipped to the floor. He said the defendant got up and told the victim, "The Tricor workers are gone. The police didn't see nothing. You can see ain't nobody scared of nobody. We done fought. Let

this be over with." He said the victim struck the defendant again, starting a third fight that lasted one or two minutes. He said the defendant fell to the floor once more, then got up, and left the building. He said that after each fight, he believed the defendant was trying to end the fighting. He said two or three officers were in the ball plant by the door during the three fights.

Inmate Sellers testified that at lunch, the defendant gave his food to him and the others at his table. He said he saw the victim sitting at his regular table with other members of the Gangster Disciples, the victim's gang. He did not know of any problem between the defendant and the victim before the fight, the defendant had never told him the defendant feared the victim or the Gangster Disciples before the fights, and he never saw the defendant or the victim fighting with anyone else.

On cross-examination, Inmate Sellers testified that upon returning from lunch and entering the industry building, inmates returned their identification cards and were frisked. He said that as he came into the industry building, he saw the defendant going out with a roller pin over his head. He said he looked out the door and saw the defendant hitting the victim on the head. He said he saw the defendant hit the victim three or four times as the victim lay on the ground. He said the victim was a lot taller and bigger than the defendant. He said that the defendant's picture from the day of the offense revealed an abrasion under his left eye.

Inmate Gary Pitman testified that he also worked at the ball plant and had known the defendant since 1998. He said that when lunch was announced on the day of the offense, he went toward the time clock and saw that the defendant and the victim had been fighting. He said he tried to stop another fight between the defendant and the victim, but the defendant hit the victim in the mouth, starting a new fight. He said the officers did not know of the fight, and it took the normal amount of time –ten or fifteen minutes – for the inmates to go to lunch. He said that he sat with the defendant at lunch and that the defendant agreed he was all right. He said he had previously told the victim to leave the defendant alone on more than one occasion. On cross-examination, he said the fights occurred between 11:30 a.m. and 11:45 a.m. He said he heard the defendant tell the victim that they had proven they would fight and were not scared of each other. He said he understood this to mean that the defendant would not let the victim bully him around anymore.

Inmate Randy Crow testified that he had known the defendant and the victim for only about a week at the time of the incident. He said he had already clocked out and did not see the defendant and the victim fight before lunch. He said the victim got in line in front of him, and the defendant yelled to the victim that "if that's all he had, he was weak."

Stanley Norris testified that he was an officer in the defendant's housing pod at West Tennessee State Penitentiary. He said that in the weeks before the offense, he noticed a change in the defendant's behavior and that the defendant was not socializing in the pod like he normally did. He said that when asked about it, the defendant said he was having a problem at work. He said that the defendant was not specific about this problem and that the matter did not seem serious enough to report. He said he had not had any problems with the defendant and was not aware of any problems between the defendant and the other guards.

Tony Lee Fulkerson testified that he was formerly a correctional officer at the prison and had worked in the unit that housed both the defendant and the victim. He said that the defendant lived in pod 3-A and that he thought the victim lived in pod 3-B. He said the defendant came to him and asked him what to do about the victim. He said the defendant told him that the victim wanted him as his boyfriend but that the defendant did not want this relationship. On cross-examination, he admitted that inmates lie to him regularly and that he did not know if the defendant's complaint about the victim was true. He said that he told the defendant about the grievance procedure and to whom he should talk but that the defendant never requested to be moved.

Johnny Hamby testified that he is a supervisor at the Wilson ball plant. He said the defendant had worked there eight months and was a hard worker. He said he had not seen the defendant involved in any fights. The defendant and the victim both operated automatic tape machines about twelve feet apart. Open rollers connected two conveyor belts, but he did not know that two of the roller pins were not secure. He said one pin near the defendant's workstation and one near the victim's workstation were loose and could be removed. The pin close to where the victim worked had not been removed. He said he is on the plant floor "pretty well" all the time but admitted the plant is very large. He denied that an inmate could be attacked on the open floor of the plant without his knowledge but said an attack could possibly occur behind the stacks of empty boxes before they were broken down. He said that if a fight were to occur, the other inmates would start yelling. He admitted that if the inmates did not yell, then something could happen that he might not know about. He said that he hands out the tools – two box knives, five pairs of scissors, and one band tightener – and that each tool is assigned to an inmate based on his specific job. He said the tools are not checked in when inmates go to the bathroom, but the inmates must turn their tools in before going to lunch.

Lieutenant Russell Keesler testified that while working in Internal Affairs, he investigated gangs, including the Gangster Disciples. After reviewing his report, he said he investigated the victim in 1995 for directing other inmates to assault an inmate named Nelson. The victim was placed in maximum security at the time. On cross-examination, he said that although he could only vaguely remember the victim, he did not believe the victim went to court over the assault.

Barbara Scoley, a clerk in the prison's records office, produced the victim's prison records. The victim's TDOC admission assessment sheet revealed that the deaf victim had problems relating to other inmates and was involved in several fights. A TDOC disciplinary report and an involuntary administrative segregation placement report disclosed that in 1995, the victim was involved in an assault of another inmate and was placed in involuntary administrative segregation as a result of the attack. Another TDOC disciplinary report stated that in April 2000, six members of the Gangster Disciples, including the victim, assaulted another inmate.

Based upon this testimony, the jury convicted the defendant of second degree murder.

# I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his second degree murder conviction because the proof shows that he acted in self-defense. He also argues that the evidence is not sufficient to support a finding that he knowingly killed the victim but, instead, shows the existence of adequate provocation for the killing. The state argues that the evidence is sufficient to support his conviction. We agree with the state.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. See Tenn. Code Ann. §§ 39-13-201, -210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b). Tennessee's self-defense statute, Tenn. Code Ann. § 39-11-611(a), provides as follows:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

The state has the burden of negating any defense raised by supporting evidence. See Tenn. Code Ann. § 39-11-201(a)(3).

The defendant contends that the evidence shows that he acted in self-defense because he reasonably believed the force he used was necessary to protect himself from the victim, who had threatened to rape him and had assaulted him just before the offense. He claims that he and the victim were confined together and that he would not have been able to flee if the victim attacked him. In response, the state points to the abundance of evidence refuting self-defense, including the victim being unarmed; testimony that the defendant was not afraid of the victim; and the defendant's retrieving a metal roller pin, crossing the building, and striking the victim repeatedly.

-10-

We believe the evidence is sufficient to warrant the jury's rejection of self-defense because the defendant did not have a reasonable belief that force was immediately necessary to protect himself. Although the victim instigated three fights with the defendant before lunchtime, the defendant's beating of the victim occurred an hour after these fights at a time when the victim posed no immediate threat to him. Inmate Gary Pitman testified the fights between the defendant and the victim occurred between 11:30 a.m. and 11:45 a.m. Officer Jason Hurst testified that the inmates go to eat around 11:45 a.m. and have about one hour to eat. According to Officers Hurst and Hooper, the attack on the victim occurred about 12:45 or 12:47 p.m., as the inmates were returning from lunch. Nurse Stephanie Maxwell testified that she was called to the scene of the attack at 12:45 p.m. Taken in the light most favorable to the state, approximately one hour passed from the time of the fights to the time the defendant beat the victim with a metal roller pin. The evidence also shows that at the time the defendant attacked him, the victim was unarmed. Although the defendant claims that the victim flashed something in his coat inside a brown bag at him, he admitted he did not know that it was a weapon. Officer Hurst testified that inmates were searched for utensils and contraband as they left the dining area.

The defendant also claims that the victim threatened to rape him after they entered the industry building and grabbed his buttocks shortly before he killed him. After lunch, the defendant traveled 193 feet to the industry building and an additional 84 feet inside the industry building to the location of the roller pin. The defendant was searched by Officer Hooper as he entered the ball plant. Then, the defendant, passing Officer Hooper again, ran back to the door leading to the outside of the industry building where the victim was standing. Officer Hooper testified that there was no threat to the defendant as he ran out of the building with the roller pin. Furthermore, the defendant repeatedly struck the victim with a metal roller pin, continuing to hit the victim even after he had fallen to the ground. The jury could have rationally concluded that the defendant responded with more force than was necessary to protect himself. Although the defendant contends that his fear that the victim would rape him was reasonable, Johnny Hamby testified that he was on the ball plant floor nearly all the time and that it was unlikely that an inmate could be attacked without him knowing about it. The credibility and weight to be given to a witness's testimony are issues to be resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). There was ample evidence for the jury to reject the defendant's claim of self-defense.

The defendant also summarily contends that even if the jury properly rejected his self-defense claim, it should have convicted him of voluntary manslaughter rather than second degree murder because the proof shows the victim caused adequate provocation to lead him to act irrationally. Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Viewed in the light most favorable to the state, the evidence supports the jury's finding that the defendant unlawfully and knowingly killed the victim. The defendant walked to the conveyor belt inside the industry building, retrieved a metal roller pin, and ran out of the building. As the defendant left the building, he struck the victim seven or eight times with the roller pin, three or four times after the victim had fallen to the ground. As the defendant struck the victim, he repeatedly yelled for the victim to die. Corporal Bryan Fiedler and

Investigator Joseph Vernon testified that there were items in the industry building more accessible than the roller pin that could be used as weapons  We believe that a rational jury could have found that the defendant beat the victim knowing that his conduct was reasonably certain to cause the victim's death.  We note that the trial court instructed the jury on voluntary manslaughter, but the jury believed that the defendant knowingly killed the victim without adequate provocation. "Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury." State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).  We conclude that the evidence is sufficient to support the conviction.

## II.  DENIAL OF CONTINUANCE

As a part of his sufficiency argument, the defendant contends in passing that the trial court erroneously denied his request for a continuance to secure proof of the victim's prior acts of violence.  He argues that the victim's status as a convicted violent rapist was a character trait essential to his claim that he acted in self-defense because the victim was threatening to rape him. See Tenn. R. Evid. 405(b) (providing that proof of specific instances of a person's conduct are admissible in cases "in which character or a trait of character of a person is an essential element of a charge, claim, or defense").  He asserts that this evidence was admissible to corroborate his theory that the victim was the first aggressor.  The state contends that the defendant has waived this issue by failing to include it in his new trial motion.  It also argues that he has failed to show that the trial court abused its discretion in denying the continuance, pointing out that the defendant presented evidence of the victim's gang-related violence while incarcerated to corroborate his theory that the victim was the first aggressor.  It asserts that the defendant has failed to show or even to argue that the granting of the continuance would have resulted in a different outcome at trial.

On May 3, 2001, the defendant moved for a continuance of the May 30, 2001 trial date, arguing that the penitentiary had hindered his investigation requiring defense counsel to seek court orders for discovery and that he needed to investigate a possible sanity or competency issue.  On May 5, 2001, the court ordered that the defendant's attorney and investigator be allowed to examine the victim's institutional file.  On May 23, 2001, the trial court granted the defendant's motion for a continuance based upon a showing of good cause and ordered that the trial be continued to October 8, 2001.  On October 5, 2001, the defendant filed an ex parte motion for a continuance and supporting affidavit alleging that the defense needed additional time to find the deceased victim's prior rape and assault victims and to interview them about the deceased victim's grabbing of their buttocks prior to his attacking them.  The affidavit stated that on September 12, 2001, defendant told defense counsel that the victim grabbed his buttocks just before the defendant ran into the work area and secured the roller pin.  It alleged that counsel had only the previous day located this court's opinion in the victim's convicting case, State v. Williams, 920 S.W.2d 247 (Tenn. Crim. App. 1995), and needed additional time to travel to Nashville and examine the appellate record in that case. Following a hearing on that same day, October 5, 2001, the trial court entered an order denying the motion.  It found that the opinion in the deceased victim's case had been a matter of public record since 1995, that it had already granted one continuance in the case, that the defendant did not know any of the deceased's victims or alleged actions before the offense, and that the likelihood of gaining

admissible evidence from the victims of the deceased was small. The defendant did not raise the denial of this specific continuance request in his motion for a new trial.

The defendant's failure to raise the issue in his motion for a new trial precludes our review of this issue, subject to our noticing plain error. See T.R.A.P. 3(e) (providing that grounds upon which a new trial are sought but which are not raised in a motion for new trial will be treated as waived on appeal), 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error). The granting of a continuance rests within the sound discretion of the trial court. Moorehead v. State, 219 Tenn. 271, 274-75, 409 S.W.2d 357, 358 (1966). We will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). In order to show prejudice, the defendant must demonstrate that a different result might reasonably have been reached if the trial court had granted the continuance. Id. In Moorehead, our supreme court stated that the trial court's exercise of discretion will not be disturbed on appeal "unless something is developed in the after trial to show that the defendant might have been prejudiced in some way by the refusal to grant a continuance." 219 Tenn. at 275, 409 S.W.2d at 358-59.

In the present case, the trial court's denial of a continuance was not error. As the trial court noted, this court's opinion in the victim's case was filed in 1995. In examining the sufficiency of the evidence, the Williams opinion notes that the deceased victim assaulted three women by grabbing their buttocks on the evening before the offense. Furthermore, as the state notes, the defendant was required to offer any helpful witnesses whom he would have presented at trial at a hearing on his new trial motion. Thus, the defendant has failed to show how he was prejudiced by the trial court's denial of his request for a continuance. We discern no plain error and decline to fault the trial court's exercise of discretion.

### III. SENTENCE

The defendant contends that the trial court erroneously sentenced him as a career offender because his conviction for first degree murder and four convictions for Class A felonies stemmed from a single course of conduct in December 1991. He argues that the state failed to prove that these convictions caused or threatened bodily injury. The state contends that the trial court properly sentenced the defendant as a career offender. We agree with the state.

At the sentencing hearing, the state introduced certified judgments along with their corresponding indictments relating to the defendant's convictions pursuant to guilty pleas for four offenses occurring on December 11 through 12, 1991: The first degree murder of Sandra Faye Hill; the attempted first degree murder, a Class A felony, of Latonya Hill; and two counts of especially aggravated kidnapping, a Class A felony, of Sandra Faye Hill and Anna Faye Hill. With respect to the especially aggravated kidnapping of Anna Faye Hill, the four count indictment charges two counts of especially aggravated kidnapping based upon the victim's age being less than thirteen and two additional counts of that offense based upon the defendant's use of a deadly weapon, a pistol.

Likewise, the four count indictment relating to the especially aggravated kidnapping of Sandra Faye Hill charges two counts based upon serious bodily injury to the victim and two based upon the use of a deadly weapon, a pistol. Neither judgment for especially aggravated kidnapping indicates to which count of the indictment the defendant pled.

The trial court found that the defendant was a career offender because of his prior convictions for first degree murder and three additional Class A felonies. It declined to consider these offenses to be a single course of conduct because it found that the acts resulted in or threatened bodily injury. It determined that even if it were to consider the especially aggravated kidnapping and first degree murder of Sandra Faye Hill to be a single course of conduct, the defendant still had sufficient prior convictions to qualify as a career offender. Although it noted that it did not have to weigh the enhancement and mitigating factors in order to impose the maximum sentence for a career offender, see Tenn. Code Ann. § 40-35-108(c), the trial court applied the following enhancement factors: (1), that the defendant had a history of criminal convictions or behavior beyond that necessary to establish his range; (5), that he treated the victim with exceptional cruelty during the offense; (8), that he had a previous history of unwillingness to comply with the terms of release into the community; and (10), that he had no hesitation in committing an offense when a high risk to human life existed. Tenn. Code Ann. § 40-35-114 (Supp. 2001) (amended 2002).[1] It found that no mitigating factors applied and imposed a sixty-year sentence, the maximum in the range. It observed that the defendant was statutorily required to serve one hundred percent of his sentence as a violent offender. See Tenn. Code Ann. § 40-35-501(i)(1)-(2)(B). Finally, the trial court ordered that the defendant's present sentence run consecutively to the life sentence he was serving at the time of the offense, finding him to be a dangerous offender with an extensive criminal record. See Tenn. Code Ann. § 40-35-115(2), (4).

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d), -402(d). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In conducting our de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on

---

[1] The legislature's 2002 amendment to Tenn. Code Ann. § 40-35-114 added as the new enhancement factor (1) that the "offense was an act of terrorism" but changed the existing enhancement factors only in increasing their designating number by one.

his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

In the present case, the trial court sentenced the defendant as a career offender. To fall within this classification, a defendant must have at "least three (3) Class A or any combination of four (4) Class A or Class B felony convictions if the defendant's offense is a Class A or B felony." Tenn. Code Ann. § 40-35-108 (a)(2). In applying this statute, convictions "for multiple felonies committed as a part of a single course of conduct within twenty-four (24) hours constitute one (1) conviction for the purpose of determining prior convictions; however acts resulting in bodily injury or threatened bodily injury to the victim or victims shall not be construed to be a single course of conduct." Tenn. Code Ann. § 40-35-108(b)(4). The defendant, convicted of a Class A felony, argues that he does not have the required qualifying offenses to be a career offender because the two especially aggravated kidnappings, the murder and attempted murder occurred during a single course of conduct on December 11-12, 1991. He asserts that the state presented no proof that the especially aggravated kidnappings or the attempted murder caused or threatened bodily injury to the victims.

Initially, we note that a certified judgment of a prior felony conviction is prima facie evidence of the facts contained therein. Tenn. Code Ann. § 40-35-202(a). Unquestionably, the defendant's conviction for the first degree murder of Sandra Faye Hill is a conviction that resulted in bodily injury to the victim. Likewise, we believe that his conviction for attempted first degree murder at the very least threatened bodily injury to the victim, Latonya Hill. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:"

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a). The defendant's attempting the premeditated, first degree murder of Latonya Hill under any of these three subsections would threaten bodily injury, i.e., death.

Finally, although the record does not reveal whether the defendant's especially aggravated kidnapping conviction relating to Sandra Faye Hill was aggravated by her serious bodily injury or his use of a deadly weapon, both remove the conviction from the twenty-four-hour merger rule.

Serious bodily injury by definition encompasses bodily injury. Tenn. Code Ann. § 39-11-106(34). With respect to the use of a deadly weapon, this court has held that a great potential for bodily injury necessarily exists whenever a deadly weapon is used. State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995) (holding that factor (16) should not be applied to enhance an especially aggravated robbery conviction because it encompasses an element of the offense). Thus, the judgments support the trial court's finding that the defendant has three convictions of Class A or higher that resulted in or threatened bodily injury to a victim. Although the trial court surmised that the especially aggravated kidnapping conviction relating to Sandra Faye Hill and the first degree murder conviction could constitute a single course of conduct because they relate to the same victim, the plain language of section 40-35-108(a)(4) contemplates that the acts could cause or threaten bodily injury to a single victim. We conclude that the trial court properly sentenced the defendant as a career offender.

Based upon the foregoing and the record as a whole, we affirm the trial court's judgment of conviction.

_____
JOSEPH M. TIPTON, JUDGE